**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

STEVEN LIND, as Administrator of the Estate of
DAVID LIND, Deceased,

                    Plaintiff,

    v.                                    1:20-cv-00574 (AMN/DJS)

UNITED STATES OF AMERICA,

                    Defendant.

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **LAMARCHE SAFRANKO LAW PLLC**<br>987 New Loudon Road<br>Cohoes, New York 12047<br>*Attorneys for Plaintiff* | **GEORGE E. LAMARCHE, III,**<br>**ESQ.** |
| **U.S. DEPARTMENT OF JUSTICE**<br>445 Broadway, Room 218<br>James T. Foley U.S. Courthouse<br>Albany, New York 12207 | **CATHLEEN B. CLARK, ESQ.** |
| **OFFICE OF THE UNITED STATES ATTORNEY**<br>445 Broadway, Room 218<br>James T. Foley U.S. Courthouse<br>Albany, New York 12207<br>*Attorneys for Defendants* | **C. HARRIS DAGUE, ESQ.** |

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

On May 26, 2020, Steven Lind, as administrator of the estate of David Lind ("Plaintiff"), commenced this action against the United States of America ("Defendant") under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA"), seeking $2 million in damages for the April 7, 2017 death of his son following medical care at the Institute for Family Health ("IFH"), a

deemed entity for purposes of the FTCA. Dkt. No. 1 ("Complaint"); Dkt. No. 5 at ¶ 7; 42 U.S.C. § 233(g)-(n). Plaintiff asserts claims for (i) pain and suffering, and (ii) wrongful death against four employees of IFH: Dr. Wesley Ho, Dr. Phillip Weiss, Nurse Practitioner Dianne Wolff, and Physician Assistant William Bakey (collectively, "IFH Medical Personnel"). Dkt. No. 1 at ¶¶ 11-32.

Presently before the Court[1] is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), seeking dismissal of Plaintiff's Complaint. Dkt. No. 32 ("Motion"). Plaintiff submitted responsive papers in opposition and Defendant submitted reply papers in further support. Dkt. Nos. 35, 36.

For the reasons set forth below, Defendant's Motion is granted in part and denied in part.

## II. BACKGROUND[2]

### A. The Parties

Decedent David Lind ("Mr. Lind"), born in May 1973, was the oldest of Plaintiff's four children. Dkt. No. 32-24 at ¶ 1; Dkt. No. 32-2 at 12:17-13:7.[3] Because of Mr. Lind's mental disabilities, Plaintiff placed him in institutional care in the mid-1980s, when Mr. Lind was approximately 11 years old. Dkt. No. 32-24 at ¶¶ 2-4, 8. Mr. Lind remained in residential care within New York State for more than 30 years, until his death in April 2017. *Id.* at ¶ 9. Plaintiff and numerous members of his family regularly visited and communicated with Mr. Lind over the years, and Plaintiff and his wife also served as Mr. Lind's legal guardian. Dkt. No. 32-2 at 27:3-

---

[1] This case was reassigned to the undersigned on February 16, 2024. Dkt. No. 37.
[2] Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. The Court has also considered the parties' other submissions and attached exhibits. *See generally* Dkt. Nos. 32, 35-36.
[3] Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

31:22; Dkt. No. 32-24 at ¶¶ 16-17.

Starting in 2010, Mr. Lind received psychiatric and primary medical care at IFH in Kingston, New York. Dkt. No. 32-24 at ¶ 21; Dkt. No. 1 at ¶ 8. IFH Medical Personnel provided medical care to Mr. Lind in March and April 2017. Dkt. No. 32-24 at ¶¶ 47, 59, 74; Dkt. No. 1 at ¶¶ 12-21. Because of the nature of IFH's operations[4] at all relevant times, certain claims, such as the medical malpractice claims here, can be pursued against Defendant pursuant to the FTCA. Dkt. No. 32-24 at ¶ 22; 42 U.S.C. § 233(g)-(n).

### B. Medical Treatment

In 2016, IFH prescribed a particular medication (Clozaril) for Mr. Lind's mental health. Dkt. No. 32-24 at ¶¶ 30-33. Despite Clozaril's advantages, one of its risks is a condition that leads to low levels of a particular type of white blood cell—weakening the immune system and increasing the risk of potentially life-threatening infections. *Id.* at ¶¶ 36-40. Accordingly, the U.S. Food and Drug Administration ("FDA") requires periodic lab work to monitor for this condition, as well as the discontinuation of Clozaril should the relevant white blood cell count drop below a certain level. *Id.* at ¶¶ 41-42.

On March 31, 2017, N.P. Wolff received lab work indicating that Mr. Lind's white blood cell count had dropped below that level. *Id.* at ¶¶ 45-46. In accordance with FDA guidelines, N.P. Wolff ordered that Mr. Lind discontinue Clozaril and have his labs checked regularly. *Id.* at ¶¶ 47-51.

---

[4] "[C]ertain health centers that receive federal funding under the Public Health Service Act and serve "medically underserved" populations can be "deemed" by HHS [the Department of Health and Human Services] as federal health providers even if they are private organizations. These federal health providers are considered federal employees for purposes of medical malpractice claims, and plaintiffs wishing to sue the providers or their employees must comply with the requirements of the FTCA." *Phillips v. Generations Fam. Health Ctr.*, 723 F.3d 144, 147 (2d Cir. 2013) (citations omitted).

3

On April 2, 2017, Mr. Lind's caretakers transported him to the Kingston Hospital Emergency Room for such a lab check. *Id.* at ¶ 53. Mr. Lind exhibited seemingly stable vital signs and reported that he was "feeling well." *Id.* at ¶¶ 54-55.

On April 3, 2017, Mr. Lind's caretakers transported him to IFH for another lab check. *Id.* at ¶ 56. P.A. Bakey evaluated Mr. Lind. *Id.* at ¶¶ 59-61. Mr. Lind exhibited symptoms consistent with withdrawal from Clozaril, but his vital signs were again seemingly stable. *Id.* at ¶¶ 57-58.

On the morning of April 6, 2017, Mr. Lind's caretakers again transported him to IFH for evaluation. *Id.* at ¶ 66. N.P. Wolff performed the initial evaluation. *Id.* at ¶ 67. Mr. Lind again exhibited seemingly stable vital signs and symptoms consistent with withdrawal from Clozaril. *Id.* at ¶¶ 68-69. N.P. Wolff ordered Mr. Lind's Clozaril resumed based on lab work indicating it was safe to do so. *Id.* at ¶ 72. However, in light of Mr. Lind's withdrawal symptoms, N.P. Wolff also requested that Dr. Ho, an internist, perform an additional evaluation of Mr. Lind that morning. *Id.* at ¶ 74.

During Dr. Ho's evaluation, Mr. Lind's vital signs were again seemingly stable. *Id.* at ¶¶ 76-77. Mr. Lind denied having headaches, shortness of breath, and chest pain, as well as any complaints of pain more generally. *Id.* at ¶¶ 78-79. Dr. Ho's physical exam of Mr. Lind, including Mr. Lind's lungs and heart, did not identify any issues. *Id.* at ¶¶ 84-86. Dr. Ho also took an electrocardiogram ("EKG") of Mr. Lind's heart. *Id.* at ¶ 88. Due to Mr. Lind's shaking, several EKGs ultimately needed to be taken to obtain a usable one. *Id.* at ¶¶ 88-89; Dkt. No. 32-23 at 34:14-35:13. Dr. Ho's interpretation of the readable portions of that EKG did not identify anything outside of normal limits. Dkt. No. 32-24 at ¶¶ 95-96; Dkt. No. 32-23 at 32:14-33:10. While the IFH computer's ability to interpret this specific EKG remains unclear to the Court, the computer's readout suggested the presence of a very rare heart condition ("accelerated junctional rhythm").

Dkt. No. 32-24 at ¶¶ 90-93.

Following his examination of Mr. Lind, Dr. Ho assessed him as "grossly normal except parkinsonian resting tremors which [are] likely due to medication being adjusted." Dkt. No. 33-4 at 62. Dr. Ho also noted that Mr. Lind's medication would be resuming shortly. Dkt. No. 32-24 at ¶ 97. Dr. Ho ordered follow-up labs and advised Mr. Lind's caretakers of "warning signs and symptoms" that would necessitate medical intervention. *Id.* at ¶¶ 98-99. Mr. Lind returned to his group home in Ulster County following this evaluation. *Id.* at ¶ 100; Dkt. No. 1 at ¶ 5.

### C. Mr. Lind's Death

On April 7, 2017, Mr. Lind's caretaker interacted with him at approximately 6:00 a.m., without issue, before finding him unresponsive at approximately 8:30 a.m. Dkt. No. 32-24 at ¶¶ 106-110. Mr. Lind was pronounced dead soon after. *Id.* at ¶ 105. Between Mr. Lind's visit to IFH the prior morning and his death on this day, there is no indication in the record of any further developments or problems with his health. *Id.* at ¶¶ 101, 102, 109.

On April 8, 2017, forensic pathologist Dr. Charles A. Catanese performed an autopsy and concluded that Mr. Lind had a different very rare heart condition ("fibromuscular dysplasia of [the] coronary arteries with myocardial fibrosis") that resulted in sudden cardiac death. *Id.* at ¶¶ 114, 118-119.

### D. Challenged Expert Opinion

While the parties have submitted numerous expert opinions, the Motion challenges only the qualifications and reliability of cardiologist Dr. Bruce D. Charash, one of Plaintiff's retained experts.[5] Among his professional qualifications, Dr. Charash has board certifications in cardiology

---

[5] The Motion's jurisdictional challenge to the opinions of Dr. Elie G. Aoun is addressed in Section IV.C, *infra*.

and internal medicine and has been licensed to practice medicine in New York State since 1982. Dkt. No. 35-1 at ¶¶ 1-4.  In the main, Dr. Charash opines that:

> Dr. Wesley Ho deviated from the accepted standard of care through his failure to refer David Lind to the Emergency Room upon his evaluation on April 6, 2017.  It is my further opinion that had Dr. Ho referred Mr. Lind to the Emergency Room on April 6, 2017, Mr. Lind would not have died on April 7, 2017, and would be alive today.

*Id.* at ¶ 7.

More granularly, and as most relevant here, Dr. Charash further opines that:

- Mr. Lind had been previously diagnosed with "sinoatrial node dysfunction," ("SND") which indicates "some form of conduction system disease," essentially, "a problem with the electrical system that controls the heart's rate and rhythm."  *Id.* at ¶ 9.

- Because of this disease, Mr. Lind was "at high risk for developing sub-clinical diseases in his conduction system."  *Id.* at ¶ 10.

- When IFH discontinued Mr. Lind's Clozaril, Mr. Lind experienced "cholinergic rebound," a physiological reaction whereby his body responded to the withdrawal of his medication by "slow[ing] the electrical conduction in the heart; hence any underlying abnormality can become clinically expressed."  *Id.* at ¶¶ 18-21.

- The April 6, 2017 EKG indicates that Mr. Lind had accelerated junctional rhythm.  *Id.* at ¶¶ 26-27, 32.

- This particular rhythm "indicates a potentially life-threatening failure of the electrical system" because there "is not a reliable way for electricity to continue to be generated in the heart" and thus the heart's electrical function "is vulnerable to abrupt failure."  *Id.* at ¶¶ 29-30.

- Mr. Lind's "cholinergic rebound" suppressed his heart's electrical function and also risked completely suppressing this particular rhythm, which would "and as it turns out, did result in sudden cardiac death."  *Id.* at ¶ 37.

- Based on the computer's indication of this particular rhythm, the apparent diagnosis of SND in Mr. Lind's chart, and Mr. Lind's ongoing "cholinergic rebound," Dr. Ho should have sent Mr. Lind to the hospital for cardiac monitoring.  *Id.* at ¶¶ 32-34, 36-39.  Had Dr. Ho done so, Mr. Lind would not have died "from the complete failure of his heart's electrical system."  *Id.* at ¶¶ 40-41.

- As it relates to the autopsy findings, Dr. Charash does "not dispute the findings in the tissue samples examined by Dr. Catanese" but does "dispute the cause of death, which, as a clinical cardiologist, [he is] qualified to address." *Id.* at ¶ 50.

**E. Procedural History**

As required by the FTCA, Plaintiff filed an administrative claim with HHS on March 13, 2019. Dkt. No. 32-24 at ¶ 137; Dkt. No. 32-20. HHS denied this administrative claim by letter dated December 5, 2019. Dkt. No. 32-24 at ¶ 142; Dkt. No. 32-21. Plaintiff commenced this action on May 26, 2020. Dkt. No. 1. Like the administrative claim, the essence of the Complaint's allegations is that following the discontinuation of Mr. Lind's Clozaril on March 31, 2017, IFH Medical Personnel failed to render proper medical care to Mr. Lind, resulting in his pain, suffering, and eventual death on April 7, 2017. Dkt. No. 1 at ¶¶ 20-32; Dkt. No. 32-24 at ¶¶ 138-141.

**III. STANDARD OF REVIEW**

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

**IV.   DISCUSSION**

The Motion's core argument is that Defendant is entitled to summary judgment because Plaintiff has failed to provide admissible expert testimony demonstrating that Defendant's departure from the relevant standard of care caused Mr. Lind's death. In support, Defendant primarily argues that: (i) Dr. Charash's causation opinions are inadmissible because he is not qualified and his opinions are unreliable; (ii) Dr. Aoun's standard of care opinions are inadmissible because this Court lacks jurisdiction over the claims to which the opinions relate; and (iii) Plaintiff has failed to provide any expert opinion at all for his claims against three of the four IFH Medical Personnel. Dkt. No. 32-25 at 18-26.

8

A. **Necessity and Admissibility of Expert Testimony**

Because all relevant events occurred within New York State, the Court agrees with the parties that New York law applies to the medical malpractice claims at issue in this FTCA action. Dkt. No. 32-25 at 14-15; Dkt. No. 35-6 at 10; *see also Zuchowicz v. U.S.*, 140 F.3d 381, 387 (2d Cir. 1998) ("The liability of the federal government under the Federal Tort Claims Act is determined according to the law of the state in which the injury occurred"); *accord Agyin v. Razmzan*, 986 F.3d 168, 184 (2d Cir. 2021); 28 U.S.C. § 1346(b).

A medical malpractice claim under New York law requires that a plaintiff establish "(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused plaintiff's injuries." *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994) (collecting cases); *Smith v. Sommer*, 189 A.D.3d 906, 907 (2d Dep't 2020) (same); *see also Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (collecting cases). Further, "[t]hese elements must be established by expert testimony, unless the testimony is within the ordinary knowledge and experience of the [factfinder]."[6] *Vale v. U.S.*, 673 Fed. App'x 114, 116 (2d Cir. 2016) (summary order). Given the facts of this case, the Court finds that the testimony necessary is beyond the "ordinary knowledge and experience" of the factfinder and thus expert testimony is required. *See, e.g.,* Section II.B, *supra; but see Sitts v. U.S.*, 811 F.2d 736, 740 (2d Cir. 1987) (discussing exceptions under New York law when expert testimony is unnecessary).

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). While district courts perform a "gatekeeping role" to ensure "that an expert's testimony both rests

---

[6] Despite Plaintiff's demand for a jury trial, because the United States of America is the only defendant in this case, any trial will be a bench trial. *See* 28 U.S.C. § 2402 ("any action against the United States under section 1346 shall be tried by the court without a jury").

9

on a reliable foundation and is relevant to the task at hand," *Daubert*, 509 U.S. at 597, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *U.S. v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020) (quotation omitted).[7]

> Rule 702 states:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Second Circuit has interpreted Rule 702 to require that the district court first determine whether a proposed expert is qualified to provide an opinion, before then assessing the reliability and relevance of the expert's proffered testimony. *See, e.g., Vale*, 673 Fed. App'x at 116 ("As a threshold matter, trial courts must consider whether the witness is qualified . . . before reaching an analysis of the testimony itself"); *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005) ("after determining that a witness is qualified as an expert to testify as to a particular matter . . . and that the opinion is based upon reliable data and methodology, Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will assist the trier of fact") (quotations and citation omitted); *see also Fashion-Williams v. U.S.*, No. 20-cv-08329 (JLR), 2024 WL 1195033, at *8 (S.D.N.Y. Mar. 20, 2024).

---

[7] Given the particular facts of this case, the Court need not address the significance, if any, of the 2023 amendment to Rule 702 in light of this Circuit's controlling precedent.

B. **Dr. Charash's Opinions**

Defendant's fundamental challenge to Dr. Charash's causation opinions is that because the forensic pathologist determined a "very rare" heart condition caused Mr. Lind's death, Dr. Charash, as a cardiologist and not a forensic pathologist, is not qualified to offer a contrary opinion. Dkt. No. 32-25 at 19-20; Dkt. No. 36 at 5-9. Plaintiff argues in response that (i) Dr. Charash is well-credentialed, knowledgeable, and very experienced, and (ii) New York law does not require an otherwise qualified medical expert to have a particular medical expertise in order to offer an expert opinion. Dkt. No. 35-6 at 9-13. Beyond the fact that Dr. Charash is not a pathologist, Defendant does not provide a direct response to Plaintiff's arguments.

As a threshold matter, the Court finds that Dr. Charash is qualified under Rule 702, pursuant to New York law, to proffer expert testimony on the cause of Mr. Lind's death. *See, e.g., Moon Ok Kwon v. Martin*, 19 A.D.3d 664, 664 (2d Dep't 2005) ("A physician need not be a specialist in a particular field to qualify as a medical expert and any alleged lack of knowledge in a particular area of expertise goes to the weight and not the admissibility of the testimony") (finding trial court's preclusion of medical expert's testimony on the basis that the expert was a neurologist, not a radiologist, and thus not qualified to interpret medical imaging to be erroneous); *accord Maestri v. Pasha*, 198 A.D.3d 632, 634 (2d Dep't 2021) (finding that a medical expert certified in internal medicine but not gastroenterology was qualified to offer a causation opinion relating to both internal medicine and gastroenterology); *Lyons v. Tsadyk*, No. 712894/16, 2024 WL 1081064, at *1 (2d Dep't Mar. 13, 2024) (finding that a medical expert certified in internal medicine and geriatric care, but not rehabilitative medicine, was qualified to offer a causation opinion relating to rehabilitative medicine). Further, the Court notes that Dr. Charash's opinions—consistent with his deposition testimony, *see* Dkt. No. 32-10 at 112:2-4—make clear that he is

challenging only the "physiologic cause of death" on the basis of his own clinical expertise.[8] Dkt. No. 35-1 at ¶ 50.

As to the reliability of Dr. Charash's opinions, Defendant challenges three specific opinions. In opposition to Dr. Charash's SND opinion, Defendant primarily cites to its own cardiologist's opinion and testimony as to how SND is properly diagnosed and its significance, if any, as it relates to Mr. Lind's death. Dkt. No. 32-25 at 20-22. However, it is well settled that under New York law, "[s]ummary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions since [s]uch conflicting expert opinions will raise credibility issues which can only be resolved by a [factfinder]." *Pezulich v. Grecco*, 206 A.D.3d 827, 829 (2d Dep't 2022) (quotations and citations omitted); *DiGernoimo v. Fuchs*, 101 A.D.3d 933, 936 (2d Dep't 2012) (same); *see also Breitenbach v. U.S.*, No. 1:16-CV-00011 (NAM/CFH), 2018 WL 4119039, at *12 (N.D.N.Y. Aug. 29, 2018) (denying summary judgment in part because of conflicting medical expert opinions) (collecting cases). In addition to the credibility determinations necessary to assess conflicting expert reports from two well-credentialed and experienced cardiologists, the Court also notes the existence of a factual dispute regarding whether Mr. Lind had in fact been diagnosed with SND. *Compare* Dkt. No. 35-1 at ¶¶ 9, 12*, with* Dkt. No. 32-8 at ¶ 36. While Dr. Charash's SND opinion contradicts testimony from Defendant's expert, the Court is not persuaded that Dr. Charash's opinion is unreliable. Accordingly, Defendant's Motion is denied as to Dr. Charash's SND opinion.

Defendant next challenges the reliability of Dr. Charash's EKG opinion, again primarily based on its own cardiologist's opinion to the contrary. Dkt. No. 32-25 at 22-23. Having carefully

---

[8] The relevance argument Plaintiff raises for the first time in its reply brief, *see* Dkt. No. 36 at 7, also fails in light of New York law. *See, e.g., Moon Ok Kwon*, 19 A.D.3d at 664.

examined testimony from three doctors who reviewed the EKG, the Court is left with the understanding that, given Mr. Lind's shaking at the time of the EKG, what could and could not be read from the EKG remains heavily disputed. *See* Dkt. No. 32-10 at 97:10-108:19; Dkt. No. 32-15 at 40:9-50:8, 61:8-64:15; Dkt. No. 32-23 at 32:14-36:22; Dkt. No. 32-8 at ¶¶ 53-55; Dkt. No. 35-1 at ¶¶ 23-28, 32-34. For this and the reasons immediately above, Defendant's Motion is denied as to Dr. Charash's EKG opinion. *See Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *3 (2d Cir. May 17, 2023) (summary order) (finding district court's exclusion of Dr. Charash's opinion as unreliable to be clearly erroneous in light of contested issues of fact and partially reversing summary judgment); *Rodriguez*, 72 F.3d at 1060-61.

Defendant last challenges the reliability of Dr. Charash's "cholinergic rebound" opinion, including certain statements about Mr. Lind's heart rate and blood pressure. Dkt. No. 32-25 at 23-24. As an initial matter, the Court is not persuaded by Defendant's argument that Dr. Charash's opinion is inconsistent with an apparent 50% fluctuation in Mr. Lind's recorded heart rate during his evaluation by IFH Medical Personnel on the morning of April 6, 2017. Dkt. No. 32-25 at 23. Moreover, given the disputed factual record and complexity of the competing medical opinions here, the Court cannot at this stage conclusively credit Defendant's version of events. *See Breitenbach*, 2018 WL 4119039, at *12. For these and the reasons further above, Defendant's Motion is denied as to Dr. Charash's "cholinergic rebound" opinion.

For all these reasons, Defendant's Motion is denied as to Dr. Charash's opinions.

**C. Dr. Aoun's Opinions**

Defendant argues that Dr. Aoun's opinions are inadmissible because they relate to events prior to March 31, 2017, which were not raised administratively as required by the FTCA, and thus this Court lacks jurisdiction to hear the related claims. Dkt. No. 32-25 at 24-25; Dkt. No. 36

13

at 3-5. Plaintiff's response in opposition consists of a handful of sentences and no legal authority. Dkt. No. 35-6 at 23.

The Court finds that Plaintiff did not administratively exhaust the claims to which Dr. Aoun's opinions would relate. *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) ("The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court. This requirement is jurisdictional and cannot be waived"); *accord Leytman v. U.S.*, 832 Fed. App'x 720, 722 (2d Cir. 2020) (summary order) (same).[9] Like the Complaint, the administrative claim Plaintiff filed on March 13, 2019, focused— exclusively—on events on and after March 31, 2017, including the discontinuation of Mr. Lind's Clozaril prescription, and the involvement of IFH Medical Personnel therein. Dkt. No. 32-20; Dkt. No. 1 at ¶¶ 12-22. Dr. Aoun's opinions primarily relate to events in 2016 and earlier, including another individual's responsibility for originally prescribing Clozaril to Mr. Lind. Dkt. No. 32-11 at 28-63; Dkt. No. 32-12 at 12-16. Assuming, without deciding, that Dr. Aoun is qualified and his opinions are reliable, the Court finds that they are irrelevant, as the claims to which his opinions primarily relate cannot be presented to this Court. Accordingly, Defendant's Motion is granted as to Dr. Aoun's opinions.

**D. Plaintiff's Allegations Against Dr. Weiss, N.P. Wolff, and P.A. Bakey**

Defendant argues that Plaintiff lacks any expert support for the medical malpractice claims against three of the four IFH Medical Personnel: Dr. Weiss, N.P. Wolff, and P.A. Bakey. Dkt. No. 32-25 at 25-26; Dkt. No. 36 at 1-3. Plaintiff did not respond to this argument and, more generally,

---

[9] Defendant's secondary argument that the statute of limitations also divests this Court of jurisdiction is not correct as a matter of law. *Compare* Dkt. No. 32-25 at 24-25, *with U.S. v. Wong*, 575 U.S. 402 (2015) ("we hold that the FTCA's time bars are nonjurisdictional and subject to equitable tolling"). Because Plaintiff has asserted no equitable tolling argument in opposition, however, the Court need not address the issue.

does not even reference any of these individuals in his opposition. *See generally* Dkt. No. 35-6. As a result, the Court deems this argument unopposed. *See Chacko v. Costco Wholesale Corp.*, 568 F. Supp. 3d 487, 499 (S.D.N.Y. 2021) (finding an argument unopposed and granting summary judgment on the relevant claim when a party's "opposition brief ma[de] no reference to th[e] argument").

Nonetheless looking to the parties' statements of material facts, Defendant similarly states that Plaintiff has not proffered any expert testimony in support of the allegations against these three individuals. Dkt. No. 32-24 at ¶¶ 52, 62, 75, 145, 147, 149. Plaintiff responds that he submitted "the expert opinions and declarations of Dr. Aoun and Dr. Charash to support the claim of negligence in the treatment and care of [Mr. Lind]" but offers no specific citation within such documents relating to any of the three individuals. Dkt. No. 35-5 at ¶¶ 52, 62, 75, 145, 147, 149. These vague denials are unhelpful to the Court; unsupported by the referenced documents, *see generally* Dkt. Nos. 35-1, 35-2; contradicted by the deposition testimony of Plaintiff's primary expert, *see* Dkt. No. 32-10 at 123:19-22 (Q: "Dr. Charash, other than Dr. Ho, do you have any criticisms of any of the other providers at the Institute of Family Health? A: No."); contrary to the Local Rules, *see* N.D.N.Y. L.R. 56.1(b) ("Each denial shall set forth a specific citation to the record where the factual issue arises"); and fail as a matter of law, *see Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("an expert's report is not a talisman against summary judgment").

Accordingly, the Court grants Defendant's Motion as to Plaintiff's claims against Dr. Weiss, N.P. Wolff, and P.A. Bakey.

V.   **CONCLUSION**

Accordingly, the Court hereby

**ORDERS** that Defendant's Motion, Dkt. No. 32, is **GRANTED** in part, and **DENIED** in

part, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 29, 2024
      Albany, New York

Anne M. Nardacci
U.S. District Judge